The BANK OF CAVE CITY, Cave City, Arkansas
*v.* JUSTICE FARMS, INC.

88-93                                      761 S.W.2d 921

Supreme Court of Arkansas
Opinion delivered December 12, 1988

*Highsmith, Gregg, Hart, Farris & Rutledge*, by: *John C. Gregg*, for appellant.

*Bridges, Young, Matthews, Holmes & Drake*, by: *Terry F. Wynne*, for appellee.

TOM GLAZE, Justice. This case concerns a legal dispute between the appellant, The Bank of Cave City, Arkansas (Bank) and the appellee, Justice Farms, Inc. (Justice). Their disputes ensued from Farmers & Ranchers Livestock Auction (Farmers) and its owners', Bill and Mary Davis's, sale of cattle to Justice on January 11 and 13, 1984. In connection with those sales, Farmers deposited a bank draft dated January 13, 1984, in the amount of $68,016.73, which was signed by Mrs. Davis and drawn on Justice's bank in Pine Bluff. The Bank gave Farmers and the Davises immediate credit on the Justice bank draft, which Justice later refused to honor when the draft was submitted to its bank in Pine Bluff. The Bank subsequently brought suit against Justice claiming the Bank was a holder in due course and entitled to the full amount of the draft. In the alternative, the Bank argued it was entitled to judgment because Farmers' and Justice's actions, surrounding the sale transaction and bank draft, constituted actionable fraud against the Bank. The trial court rejected the Bank's contentions and entered an order dismissing its complaint. We affirm.

On appeal, appellant first argues it was a holder in due course of the $68,016.73 draft, and for that reason, the court erred in failing to award judgment against Justice in that amount. Of course, one can be a holder in due course only of a negotiable instrument, and that instrument, among other things, must be signed by the maker or drawer. *See* Ark. Code Ann. § 4-3-104 (1987). In addition, no person is liable on a negotiable instrument unless his signature appears on it. Ark. Code Ann. § 4-3-104 (1987). In this cause, Justice undisputedly did not sign the draft in question; however, the Bank claims Mrs. Davis signed the draft as Justice's authorized agent.

Justice denied that it authorized Mrs. Davis to sign the $68,016.73 draft, and the trial court accepted Justice's account of what happened as true. The trial court further ruled that Justice properly rejected the draft when it was submitted to Justice's Pine Bluff bank. On appeal, the Bank insists the trial court was clearly

wrong in reaching this conclusion.

■■ Because Justice questioned, at trial, the effectiveness of the Davis signature on the draft instrument, the Bank, which was claiming under the signature, had the burden of establishing it. Ark. Code Ann. § 4-3-307(1)(a) (1987). The Bank urges that it met its burden, under Ark. Code Ann. § 4-3-403(1), which provides that a signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. Section 4-3-403(1) further provides that no particular form of appointment is necessary to establish such authority. The Bank argues that Justice expressly, implicitly, or apparently had authorized Mrs. Davis' signature to the draft.

The Bank's first argument relies heavily upon an earlier sale transaction, which these same parties conducted on January 4, 1984. In that transaction, Justice purchased cattle from Farmers for the sum of $20,794.69. In the years of doing business with Farmers, prior to this January 4 transaction, Justice had always paid for its purchases of cattle by check. However, on the night of January 4th, Mrs. Davis called Justice requesting its permission to draw a draft on Justice's bank to pay for that day's purchase. Justice agreed, but told Davis the draft would not be paid until the Pine Bluff bank verified the amount of the draft. As it later became evident, Farmers (and the Davises) deposited the Justice draft with the Bank, but the draft was for $40,794.69 more than twice the sale amount. Relying on the established practice between the Bank and Farmers, the Bank gave Farmers immediate credit for the full amount of the draft.

Apparently, in order to assure Justice would not bear a loss as a result of the $40,794.69 draft, Farmers mailed an unsolicited check to Justice in the approximate sum of $20,000.00. After receiving the check, Justice suspected that the draft drawn by Mrs. Davis might be for more than the January 4 sale amount. However, Justice did not contact Mrs. Davis, but instead deposited Farmers' check and later verified with Justice's bank that the check had cleared. Justice then learned from its bank that the draft had been written for the $40,794.69 amount, but on January 16, 1984, Justice proceeded to honor and pay the draft amount, since the exchange of the check and draft resulted in

Justice being charged only the true amount of the January 4 sale. From the record, this transaction was Justice's first indication that Farmers had employed the practice of check-kiting when selling cattle. On this point, and as we previously mentioned, Justice had always paid Farmers by check when buying cattle and drafts had never been mentioned.

The Bank contends Justice became aware of the check-kiting practice of Farmers and the Davises as a result of the January 4 transaction and that knowledge served to make Justice liable for the January 11 and 13 sales or second transaction, which is in issue in this appeal. The Bank urges acceptance of this argument even though there is no direct evidence (as existed in the January 4th sale) that Justice had approved or authorized either Farmers or Mrs. Davis to sign a draft.

This second transaction, as earlier noted, involved Justice's purchase of cattle from Farmers on January 11 and 13. The total purchase price was $30,864.17. Justice mailed checks in this amount to Farmers but stopped payment on those checks when he received another unsolicited check from Farmers in the amount of $40,030.19. Although Justice never authorized any draft, it suspected a draft would be forthcoming since Justice received another unsolicited check from Farmers. Indeed, Mrs. Davis had drawn another draft on January 13, 1984, payable to Farmers in the amount of $68,016.73, or more than twice the sale amount, and again the Bank gave immediate credit to Farmers when it deposited the draft. Later, sometime in the week of January 16, 1984, Mrs. Davis called Justice and explained the $40,030.19 check sent Justice was insufficient. She instructed Justice not to honor the $68,016.73 bank draft and to pay Farmers by check, which Justice did.

To support its claim that Justice authorized Mrs. Davis to sign the $68,016.73 bank draft and should be obligated to pay the Bank as a holder in due course, the Bank argues that the evidence reflects Justice never actually claimed Mrs. Davis was unauthorized to sign the draft and that issue concerning her authority was only raised after litigation ensued. The Bank submits that had Farmers' $40,030.19 unsolicited check been sufficient, Justice would have honored the draft signed by Mrs. Davis. The Bank's argument ignores the undisputed evidence

that Justice never authorized the second draft and became aware of that draft *after* Farmers had deposited the draft in its account with the Bank and the Bank had already given Farmers the full amount of the draft. It was only after these events occurred that Justice received his second unsolicited check from Farmers, which caused Justice to suspect that Farmers and Mrs. Davis had drawn another draft on Justice's bank. It is also significant that Justice had resumed its past practice of paying for its cattle purchases by mailing Farmers checks in payment for its purchases on January 11 and 13. Based on this evidence, the trial court could reasonably find—as it obviously did—that Justice never expressly or impliedly authorized Mrs. Davis to draw the second draft.

The Bank further argues that even if Justice did not authorize the signature of Mrs. Davis, Justice certainly ratified her signature or was precluded from denying it under Ark. Code Ann. § 4-3-404(1) (1987). Section 4-3-404(1) provides as follows:

> Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

The Bank claims it was justified in honoring the second draft signed by Mrs. Davis based upon Mrs. Davis having signed the draft in the first cattle sale transaction. Clifton Crabtree, a cashier and officer of the Bank, testified that the Bank had knowledge at the time of the second draft that the previous draft had cleared on Mrs. Davis's signature. The record fails to support that conclusion. The first draft, joint exhibit number four, reflects that it had not been stamped paid until January 16. Thus, the Bank could not have known the first draft would have been honored and paid until January 16; the Bank, on the other hand, had already given Farmers immediate credit on January 13, the date the second draft was submitted to the Bank.

We also note that Justice's actions, themselves, counter any suggestion that it ratified Mrs. Davis's having signed the second draft. After Justice bought the cattle on January 11 and 13, it paid for them by check and only became aware that Mrs.

Davis had signed another draft when Justice received the second unsolicited check. At that point, Justice could have done nothing to have prevented the Bank's loss, since the Bank had already given Farmers credit on the second draft. Instead, Justice proceeded to cut its own potential loss by stopping payment on the checks it had previously mailed Farmers in payment of Justice's January 11 and 13 purchases of cattle. We cannot agree that the actions taken by Justice in any way ratified or precluded Justice from denying it gave authority to sign the second draft.

██ Finally, appellant contends Justice fraudulently participated with Farmers in Farmers' check-kiting scheme because Justice conceded it knew what was "probably happening" when it, on two separate occasions, deposited the unsolicited checks from Farmers.[1] We disagree. The facts already discussed reflect that Justice was not fully apprised of Farmers' or the Davis's actions and the record clearly supports the trial court's finding that Justice did not act in concert with Farmers or Mrs. Davis to defraud the Bank. Certainly, the Bank was in no position to say it could justifiably rely on Justice's conduct in view of the knowledge the Bank possessed concerning Farmers' precarious financial situation and manner of doing business. Without being unnecessarily repetitive of the facts already mentioned, we add that the Bank was quite aware that Farmers had a cash flow problem. The Bank knew Farmers would write checks when it would have insufficient funds in its account, and knew that Farmers had defaulted on a loan it had with the Bank. Even so, the Bank would give Farmers immediate cash on drafts or checks drawn on accounts in other banks in anticipation that those drafts or checks would clear. Thus, the Bank knew it risked getting "stuck" with having given Farmers immediate credit if one of those other instruments—such as the two drafts in issue in this cause—were for some reason dishonored.

---

[1] In making its argument, the Bank, we note, failed to use Ark. Code Ann. § 4-3-406(1) (Supp. 1987). This statute provides that any person who substantially contributes to the making of an unauthorized signature is precluded from asserting the lack of authority against a holder in due course.

For the reasons stated above, we affirm the trial court.